## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **STOUGHTON MEDIA ACCESS CORPORATION,** )<br>)<br>) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION NO.:_____** |
| **v.** ) | |
| ) | **JURY DEMAND** |
| **THE TOWN OF STOUGHTON, MASSACHUSETTS, THOMAS CALTER III, STEPHEN CAVEY, AND JOSEPH MOKRISKY, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES,** )<br>)<br>)<br>)<br>)<br>) | |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff, Stoughton Media Access Corporation, complains against the named Defendants as follows:

## INTRODUCTION

1.      Plaintiff, Stoughton Media Access Corporation ("SMAC"), seeks compensatory, special, and punitive damages from Defendants, the Town of Stoughton (the "Town" or "Stoughton"), Thomas Calter III ("Calter"), Stephen Cavey ("Cavey"), and Joseph Mokrisky ("Mokrisky"), in their individual and official capacities, for Defendants' violations of SMAC's civil rights, including those rights protected by the First and Fourteenth Amendments, including by way of 42 U.S.C. § 1983, and the Massachusetts Civil Rights Act ("MCRA"), G.L. c. 12, § 11I. SMAC also asserts claims for defamation, breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of G.L. c. 93A. Finally, SMAC seeks a declaratory judgment and a declaration that the provisions of SMAC's bylaws that divest

SMAC's members of the ability to amend the provisions of SMAC's bylaws concerning Stoughton's control over the appointment and removal of SMAC's Directors is invalid.

2.      Stoughton, through its Town Manager Calter and its Select Board (the "Select Board"), including Select Board Chair Cavey and Select Board member Mokrisky, has threatened and continues to threaten the corporate existence of SMAC because SMAC does not allow Stoughton to direct SMAC's programming content or schedule, or SMAC's internal operations. The unlawful threats, coercion, retaliation, and interference relate particularly to matters of political significance to Defendants for which Defendants demand more favorable and frequent news coverage and to silence opposing views.

## PARTIES

3.      Plaintiff, Stoughton Media Access Corporation, is a private, 501(c)(3), non-profit corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business located at 421 Page Street, Suite #2, Stoughton, Norfolk County, Massachusetts.

4.      Defendant, Town of Stoughton, is a municipal corporation organized under the laws of the Commonwealth of Massachusetts with a principal place of business located at 10 Pearl Street, Stoughton, Norfolk County, Massachusetts.

5.      Defendant, Thomas Calter III, is, and at all pertinent times was, Stoughton's Town Manager and its Chief Municipal Officer. Upon information and belief, Calter is a resident of Kingston, Plymouth County, Massachusetts.

6.      Defendant, Stephen Cavey, is the Chair of the Select Board of Stoughton and at all pertinent times was a member of the Select Board. Upon information and belief, Cavey is a resident of Stoughton, Norfolk County, Massachusetts.

7.      Defendant, Joseph Mokrisky, is, and at all pertinent times was, a member of the Select Board of Stoughton. Upon information and belief, Mokrisky is a resident of Stoughton, Norfolk County, Massachusetts.

## JURISDICTION AND VENUE

8.      This action is brought pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution. This Court has original jurisdiction over the federal claims asserted herein pursuant to 28 U.S.C. § 1331 and § 1343. This Court has supplemental jurisdiction over the related state claims pursuant to 28 U.S.C. § 1367(a).

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

10.     SMAC was created to provide community cable television studio services for public, educational, and governmental ("PEG") access programming customary for a community studio under 47 U.S.C. § 531, the access section of the Federal Cable Act (the "Act"), to enhance community information and communication through use of its facilities and cable channels.

11.     SMAC is an independent entity. It is not part of Stoughton's municipal government, nor is it organized as a Stoughton municipal committee, board, or department. SMAC is required under the Act to remain apolitical as to the content it broadcasts. *See* 47 U.S.C. § 531(e).

12.     On or about August 9, 2023, Stoughton and SMAC entered into an Access Corporation Agreement (the "Access Agreement").[1] A true and accurate copy of the Access Agreement is attached hereto as Exhibit "A" and made a part hereof.

---

[1] Capitalized terms not otherwise defined herein shall have the same meaning as ascribed to them in the Access Agreement.

13.     Stoughton receives annual and periodic grant money from Verizon New England, Inc. and Comcast Cable Communications, Inc. (collectively, the "Cable Licensees").

14.     The Access Agreement provides that it is Stoughton's intent to use the grant money received from the Cable Licensees and any future funding sources for PEG Access Programming for the support and furtherance of PEG Access Channels pursuant to the Act. *See* Ex. A at Art. I.

15.     SMAC fulfills the mission of providing PEG Access Channels on behalf of the Cable Licensees to Stoughton's residents pursuant to the Act. *See id.* at Art. III.

16.     The Access Agreement requires that SMAC provide unbiased PEG Access Programming as a forum open to all and for all points of view in accordance with the Act, the United States Constitution, and the Massachusetts Civil Rights Act, and to not serve a partisan political agenda, engage in political activity, or act in favor or against any particular political candidate or issue. *See id.* at Art. V, Sec. 13.

17.     As to programming, the Access Agreement provides, in relevant part, that "***[e]ditorial discretion [and] the content of programming*** . . . placed on those Access Channel(s) which are operated by S.M.A.C. ***shall solely reside in and be the sole responsibility of the access producers and S.M.A.C. and not the MUNICIPALITY*** [Stoughton] . . .", and that, "***S.M.A.C. shall be solely responsible for providing live coverage***" of the Town's public meetings. *Id.* at Art. V, §§ 2, 3 (emphasis added).

18.     According to the Stoughton Town Charter, as Town Manager, Calter is "the chief administrative officer in the executive branch of the Stoughton town government" and "shall . . . be the administrative head of all departments of the Town."

19.     Also according to the Stoughton Town Charter, the Select Board "[is] the highest executive authority of the Town". The Select Board supervises, directs, and is the appointing/hiring authority for the Town Manager (Calter).

20.     The Select Board consists of five elected members. Mokrisky was a candidate for re-election to the Select Board in an election that was held on April 8, 2025.

21.     Stoughton has previously sought to control SMAC's content and scheduling, exercise prior restraint, otherwise politically influence SMAC's operations, and failing that, terminate SMAC's operations at its political whim.

22.     From December 2021 through approximately July 2022, Stoughton demanded exhaustive and voluminous records and disclosures by SMAC of material it had no basis to demand. After conducting this fishing expedition, Stoughton refused to execute a duly negotiated renewal of the then-operative previous access agreement, without basis, and contrary to the recommendation of its Town counsel.

23.     In March 2023, the Select Board hired SMAC's former counsel, who had simultaneously represented Stoughton, incorporated SMAC, and drafted SMAC's bylaws, to advise the Select Board on how to default SMAC under the then-operative access agreement, which, upon information and belief, the same attorney had drafted, based on alleged pretextual defaults and then terminate that access agreement and take over SMAC's assets, including its Enterprise Fund, which Stoughton is required to maintain for SMAC's benefit pursuant to G.L. c. 44, § 53F ½, and which funds SMAC's operations under the Act (the "Enterprise Fund").

24.     The current Access Agreement represents the negotiated settlement of this prior dispute between Stoughton and SMAC. In connection with the settlement of that dispute, the Select Board appointed two "Liaisons", Cavey and Mokrisky, to keep the Select Board engaged

with SMAC and its operations in order to avoid potential future disputes between the Select Board and SMAC. Neither of the Select Board's Liaisons raised any alleged issues, concerns, or problems with SMAC from their appointment until the October 1, 2024 Notices of Default described below.

25.    On March 14, 2024, the Stoughton Finance Committee held a public meeting that included an article on the subject of fiscal year 2025 appropriations for cable costs for SMAC's Enterprise Fund.

26.    Stoughton, through Town Finance Director Elizabeth Zaleski, reported to the Stoughton Finance Committee at the March 14, 2024 public meeting that SMAC's Enterprise Fund was in a deficit state, as Stoughton claimed to have disbursed to SMAC more than it had collected from the Cable Licensees. A deficit, if it existed, would constrain SMAC's finances. However, this claim was false, as admitted by Stoughton after the meeting.

27.    Despite SMAC's subsequent demand, including in its counsel's November 27, 2024 letter, described further below, Stoughton refused to disclose in writing to SMAC the amount in the Enterprise Fund.

28.    Cavey, the Chair of the Select Board, and Calter, the Town Manager, are members of the South Elementary School Building Committee (the "Building Committee"), a Stoughton municipal committee established to serve a public purpose: the construction of South School, a proposed elementary school in Stoughton (the "School Project").

29.    The Building Committee estimates the School Project will cost approximately $114 million, with $66 million of that total cost to be paid by Stoughton. Calter and Cavey have publicly claimed that the remainder of the cost of the School Project will be paid for by the Massachusetts School Building Authority. However, that external funding is not guaranteed.

30.     There is widespread, intense, and ongoing public debate in Stoughton concerning the School Project, including issues surrounding Stoughton's investment of $66 million towards the School Project, the financial impact of such an investment on Stoughton taxpayers, and the quality of education in Stoughton.

31.     At a Special Election held on June 11, 2024, Stoughton voters rejected a ballot question that would have authorized funding for the School Project, thereby effectively voting down the School Project.

32.     The results of the June 11, 2024 Special Election heightened the urgency for Defendants to suppress any opposition to the School Project, and to pressure, threaten, and coerce SMAC into not covering and broadcasting content that could be viewed as opposed to the School Project. Defendants believed that suppressing all SMAC content that could be perceived as opposed to the School Project would increase the chances that voters would approve the School Project in a subsequent vote.

33.     Town Manager Calter, as a member of the Building Committee, described his own efforts to win Stoughton residents' votes to construct the School Project as "passionately supportive" and has characterized obtaining approval for the School Project as a political "campaign" that he knows "how to win", including by forming and using political action committees to circulate favorable information about the School Project "around Town".

34.     The Building Committee established the Elementary School Building Independent Working Group (the "Working Group") for "community outreach". The Working Group's mission is to advance the School Project through the investigation and dissemination of information about the School Project to the residents of Stoughton.

35.     On August 29, 2024, Calter, as Stoughton Town Manager and as a member of the Building Committee, described his influence over the Working Group as a group of his own making and only including "citizens and Town employees appointed by me". Calter also proclaimed on the record at Working Group meetings that he is highly effective at obtaining his political objectives.

36.     On or about September 3, 2024, at the invitation of the Chairperson of the Working Group, a SMAC employee travelled to the Working Group meeting location and attempted to record the public meeting for airing on SMAC's public access broadcasts. On SMAC's arrival, the Working Group's Vice Chairperson ordered SMAC to leave, stating she did not want the meeting recorded.

37.     Upon information and belief, individuals attended the September 3, 2024 Working Group meeting to voice opposition to or raise issues critical of the School Project. Calter sought to prevent SMAC from recording and broadcasting the Working Group meeting on September 3, 2024 because Calter was concerned that broadcasting the opposition to the School Project at that meeting would harm the chances of the School Project being approved.

38.     In response to this order, the SMAC employee departed without recording the Working Group meeting. Later that same day, Stoughton's Assistant to the Town Manager and Select Board called SMAC and stated that Calter would not allow SMAC to record any Working Group meetings under any circumstances.

39.     At a September 4, 2024 Stoughton Select Board meeting, a Select Board member objected to Calter's edict prohibiting SMAC from recording Working Group meetings. Nonetheless, this Select Board member's objection was disregarded, and Calter prevented SMAC from recording the Working Group meetings.

40.     At a Select Board meeting the following day, Calter, as Town Manager, announced that he would not allow SMAC to record Working Group meetings. Stoughton residents expressed that they did not agree with Calter's edict, especially due to the inability of some of the residents to attend such meetings in person. Calter replied that, as Town Manager, it was his decision what gets recorded and aired in Stoughton by SMAC.

41.     At the same Select Board meeting, while interrogating a SMAC Board Member, Calter claimed that SMAC's Board of Directors unanimously voted to cover the September 3, 2024 Working Group meeting.

42.     Calter's statement was false. SMAC's Board of Directors does not dictate programming and does not have a practice of involvement in decision making as to what events are covered by SMAC or what content is aired by SMAC. SMAC's Board does not vote on what events are covered and did not vote on whether SMAC should cover the Working Group meeting. SMAC was invited to cover the meeting, which was open to the public, and had an obligation to cover the newsworthy meeting. SMAC is obligated by the Act and the Access Agreement to broadcast all points of view, including views supporting and opposing the School Project discussed at the Working Group meeting.

43.     Contrary to Calter's decision to prohibit SMAC from broadcasting recordings of Working Group meetings, on September 4, 2024, Calter stated in writing in the Stoughton Town Crier, the official newsletter for Stoughton and published by Stoughton, that the Working Group meetings were open to the public and that the Working Group encouraged public participation, such that the Working Group was a model of "public participation and transparency".

44.     On September 10, 2024, Calter again stated that he did and was going to continue to control SMAC's programming, stating in print that it is solely within the Town's discretion

whether to record Working Group meetings or not. Calter made this statement despite having invited the public to attend and participate in the Working Group meetings.

45.     On September 11, 2024, Calter visited SMAC's studio to be interviewed by a public content news producer. During the visit, Calter repeated his false claim that SMAC's Board had voted to record "his meeting" and reprimanded SMAC's Station Manager, asserting that SMAC's Board "had no right" to do so.

46.     Calter's admonishment of SMAC's Station Manager was an attempt to intimidate, coerce, and steer SMAC's coverage of the School Project to Defendants' liking.

47.     On September 12, 2024, Select Board Chair Cavey called Robert Mullen ("Mullen"), SMAC's President, a member of SMAC's Board of Directors, and the Stoughton Town Moderator. During this telephone call, Cavey falsely claimed that SMAC's attempt to cover the Working Group meeting was politically motivated, biased, and a breach of the Access Agreement. Mullen denied this false accusation.

48.     Cavey's false claim that SMAC breached the Access Agreement by attempting to record the Working Group meeting was a threat intended to chill and discourage SMAC from broadcasting opposition to the School Project and instead broadcast a disproportionate amount of programming supporting the School Project, in violation of SMAC's Access Agreement and the Act.

49.     Stoughton refused to pay $40,950.00 due to SMAC under the Access Agreement for the time period from August 2024 through October 2024. Stoughton withheld this payment in an attempt to coerce and influence SMAC's broadcasting decisions, including concerning the School Project. Stoughton finally tendered this wrongfully withheld payment to SMAC in October 2024.

50.    On October 1, 2024, Cavey, as Chair of and on behalf of the Select Board and Stoughton, served a Default Notice ("Select Board Notice") under the Access Agreement on SMAC.

51.    On the same date, Stoughton's Town Counsel, Mead Talerman & Costa, LLC, sent a Demand for Records and Litigation Hold Notice to counsel for SMAC that noted but did not specify alleged defaults by SMAC (the "MTC Letter") (collectively, with the Select Board Notice, the "Notices of Default").

52.    The Notices of Default claim pretextual (technical and non-material) alleged defaults under the Access Agreement and threaten non-renewal of the Access Agreement by the Town. Notably, from the time the current Access Agreement was executed in 2023 until the October 1, 2024 Notices of Default, neither of the Select Board's Liaisons to SMAC, Cavey and Mokrisky, ever claimed any alleged defaults by SMAC or raised any alleged issues concerning SMAC or the Access Agreement. Further, the Notices of Default do not claim SMAC was in default of the Access Agreement's prohibition on political activity nor do they claim bias by SMAC. The Notices of Default are merely a recurring tactic – previously employed by Stoughton, through Calter and Mokrisky, during its prior dispute with SMAC – to threaten, gain leverage over, and control SMAC and its assets, or failing that, to take it over by withdrawing SMAC's designation under the Access Agreement as Stoughton's public access PEG broadcast provider as the Town threatened during the prior dispute it created described above.

53.    On the afternoon of October 10, 2024, Calter telephoned Mullen (the "October 10 Call"). During this conversation, Calter excoriated Mullen for what he claimed was SMAC's "political activity", including by attempting to cover the Working Group meeting. Calter also falsely accused Mullen and SMAC of opposing the School Project. Calter's accusation was false

and intended to threaten and coerce Mullen and SMAC into providing coverage that was more favorable to Defendants' School Project and to generally intimidate, coerce, and control SMAC.

54.    On the October 10 Call, Calter warned Mullen that the Select Board was "looking into" political activity by SMAC that Defendants Calter, Cavey, and Stoughton falsely claimed. Calter further threatened that the Select Board had "everyone" looking into SMAC, including the Massachusetts State Ethics Commission (the "Ethics Commission"), the Commonwealth of Massachusetts Attorney General's Office and the Commonwealth of Massachusetts Secretary of State's Office. These threats were made to gain leverage over SMAC and Mullen, in his capacity as President and a member of the Board of Directors of SMAC.

55.    Calter also warned Mullen that he had former colleagues at the Ethics Commission with whom he is in regular contact and suggested that he could initiate an ethics complaint against Mullen.

56.    Calter went on to chastise Mullen on the October 10 Call for appointing, as Town Moderator, two (2) particular individuals to Stoughton's Finance Committee who, subsequent to their appointment, voiced opposition to the School Project. Mullen told Calter that he had no control over, nor should he have control over, the opinions or positions of these Town officials after appointment.

57.    On October 28, 2024, Select Board member Mokrisky called SMAC to complain about a SMAC video covering the groundbreaking at Stoughton Logistics Park (the "Logistics Park") on October 17, 2024. Mokrisky had publicly and extensively advocated for Stoughton's approval of the Logistics Park.

58.     The Logistics Park is an industrial park catering to truck transportation. It consists of three (3) warehouses, one hundred sixty (160) loading docks, and parking for more than one hundred fifty (150) truck trailers.

59.     Upon information and belief, Mokrisky is President of Capitol Motor Carrier Compliance, a commercial vehicle safety and compliance consultant based in Stoughton.

60.     On October 29, 2024, the next day, Mokrisky appeared at SMAC uninvited and without notice. Mokrisky berated the SMAC Station Manager and a SMAC videographer, making threatening comments and accusations about the video of the Logistics Park groundbreaking.

61.     Mokrisky declared that if he was not given credit for the Logistics Park development as a political accomplishment, he would "go to war over it" with SMAC. Mokrisky angrily complained that SMAC's officers and Directors deliberately deleted video footage of credit the developer of the Logistics Park paid to Mokrisky for the approval of the development of the site. Mokrisky falsely claimed that the absence of that footage was due to SMAC's "political motivation" against him. Mokrisky told SMAC's Station Manager and videographer that "if it were anyone else but you, I'd be leaving here in hand cuffs". Mokrisky then demanded a letter of apology for SMAC's perceived transgression.

62.     Mokrisky's accusation of SMAC's alleged political bias was false and made with the intent to exercise editorial control over SMAC's programming content by intimidating and coercing SMAC's employees into editing the video so that it was more politically favorable to Mokrisky in advance of the April 8, 2025 election.

63.     The SMAC videographer denied Mokrisky's accusation that the video was edited to be unfavorable to Mokrisky. The SMAC videographer was brought to tears as a result of Mokrisky's verbal assault.

64.     After Mokrisky's outburst, SMAC removed the video of the Logistics Park groundbreaking from its website and re-edited the video to include footage of the developer speaking about Mokrisky's role in the development.

65.     The SMAC videographer who had been accosted by Mokrisky requested to be reassigned from covering the Stoughton Select Board in order to avoid Mokrisky in future recording events. To protect its employees and to avoid such attacks in the future, SMAC has barred Mokrisky from its facility, installed security cameras, and secured the entrance to its facility.

66.     On November 27, 2024, SMAC, through counsel, responded to Stoughton's Notices of Default. In its letter, SMAC explained that the Notices of Default were a pretextual attempt to gain leverage over SMAC in order to force it to air more content in favor of the School Project, to prevent SMAC from broadcasting content in opposition to the School Project, and to generally attempt to control SMAC's operations, including its broadcasting content and schedule.

67.     The November 27, 2024 letter from SMAC's counsel to Stoughton's counsel included as exhibits a letter by Mullen on behalf of SMAC detailing and condemning the confrontation by Mokrisky and addressed to the Select Board of Stoughton (the "Mullen Letter") along with two personal statements signed and dated by SMAC's Station Manager and the videographer involved in the altercation further detailing the event and their adverse reactions to the confrontation (the "SMAC Employee Statements").

68.     A political adversary of Mokrisky made a public records request of Stoughton for the November 27, 2024 letter and the Mullen Letter and SMAC Employee Statements that were attached to it. Stoughton withheld and did not produce the Mullen Letter and SMAC Employee Statements in response to the public records request.

69.     Cavey claimed on social media that: Stoughton withheld the Mullen Letter and SMAC Employee Statements because the Select Board did not actually receive them; only the Select's Board's counsel received those communications; and the records were subject to "attorney client privilege", even though SMAC's attorney authored the November 27, 2024 letter that included as attachments the Mullen Letter and the SMAC Employee Statements.

70.     Cavey further claimed that: the Mullen Letter was part of "pending litigation", even though no litigation was pending at that time; a Select Board member had "[broken] the law" by sharing the Mullen Letter with Mokrisky's political adversary; the Mullen Letter and the SMAC Employee Statements did not say what they appeared to say because they were part of an effort by SMAC to put its "thumb on the political scales in town"; and banning Mokrisky from SMAC was "retaliation" by SMAC.

71.     Cavey publicly promised to sue a Select Board member who had requested the Mullen Letter directly from SMAC after apparently not otherwise receiving it.

72.     On January 31, 2025, Calter contacted SMAC's Station Manager by telephone. Calter stated that a former member of the Stoughton Finance Committee claimed that SMAC aired productions opposing the School Project more often than it aired productions favoring the School Project.

73.     SMAC's Station Manager explained to Calter that if the production by an opponent of the School Project had aired more frequently than a production by a proponent of

the School Project, it was because the former had produced their show several months earlier than the latter and so their production had aired on more occasions given the earlier production date.

74.    On February 12, 2025, a new public relations employee of the Town invited SMAC to a "Recycling Working Group" meeting called by Calter about contracting for waste disposal. SMAC's Station Manager and a videographer/reporter attended this meeting. At the meeting, which occurred on February 12, 2025, Calter asked SMAC's Station Manager to confirm she received the voicemail he left her on February 11, 2025. In the voicemail, Calter again claimed that one of Stoughton's former Finance Committee Members, whom Calter referred to as a very influential resident of Stoughton, was upset because they believed that SMAC's coverage of the School Project favored the opposition to the School Project and that SMAC was denying airtime to those who supported the School Project, such that SMAC was biased against the School Project.

75.    Calter's accusation that SMAC's coverage favored opposition to the School Project was false. Further, the former member of the Stoughton Finance Committee to whom Calter attributed the complaints confirmed to SMAC that he was not of that opinion when the SMAC Station Manager contacted him to address Calter's alleged concern.

76.    Calter repeated the false accusation several times at the Recycling Working Group meeting. SMAC's Station Manager explained that SMAC cannot remove opposing views from its broadcasting, and that the Access Agreement and the Act require SMAC to be unbiased. SMAC further explained to Calter that just as he wants more coverage that is pro-School Project, others want more coverage that is anti-School Project.

77.     In response, Calter told SMAC that SMAC would be sued if it did not increase the frequency of its pro-School Project coverage and increase its portrayals of the School Project in a favorable light.

78.     Calter then claimed that residents of Stoughton "know" that SMAC is biased against the School Project. This allegation is false. A member of the Select Board that attended the February 12, 2025 meeting intervened to defuse the situation as the Station Manager was clearly alarmed by Calter's threats. The member of the Select Board suggested to the Station Manager that they discuss the matter further in a call between them only. Calter, however, warned the Station Manager not to contact that Select Board member.

79.     The actions by Defendants to intimidate and coerce SMAC and its employees, including to provide pro-School Project coverage and cease providing anti-School Project coverage, has negatively impacted and continues to harm SMAC's employment relationship with its employees and damage SMAC's reputation in the community. As a result of Defendants' actions, SMAC employees have expressed a reluctance to cover events at the Select Board, making it difficult for SMAC to provide coverage of Select Board meetings as required by the Access Agreement.

80.     On February 25, 2025, one of SMAC's producers met Calter at SMAC's studio to interview Calter for a show to be aired by SMAC. Calter stopped at the Station Mager's office and threatened her with the dissolution SMAC's contract with the Cable Licensees because, Calter claimed, SMAC was "biased" against the School Project, and the Cable Licensees "do not like it" when SMAC is biased. Calter then warned the SMAC Station Manager, in reference to SMAC's November 27, 2024 response to the Town's Notices of Default: "[D]on't send any more letters to my counsel!"

81.     Given the actions of Defendants as described herein, on February 26 and 27, 2025, SMAC published a Public Service Announcement in the Stoughton Suburban Shopper and on Facebook (the "PSA") about its mission as a source of unbiased public broadcasting, news, and opinions on all sides of current affairs.

82.     In response, on February 28, 2025, Cavey posted on social media that he was "aware some people have expressed concern that SMAC is serving an anti-Schools agenda by broadcasting anti-Schools programming more frequently (by a lot) than pro-Schools programming", and that "[SMAC] created drama months ago by sending cameras to a private meeting of the Independent Working Group and were turned away".

83.     Cavey's claims were false and made for the purpose of damaging SMAC's reputation and standing in the community, pressuring SMAC into increasing its pro-School Project coverage, and retaliating against SMAC for the PSA. Moreover, the Working Group meeting referenced by Cavey was public, as Calter had stated in the Stoughton Town Crier.

84.     Defendants' false accusations of bias have damaged SMAC's reputation in the community it serves and reduces the amount of content it can attract to carry out its legal obligations under the Act and under the Access Agreement to broadcast unbiased, apolitical PEG programming.

85.     The attorneys for Stoughton who drafted SMAC's bylaws included a provision that purports to empower Stoughton to appoint and remove, without cause, at its pleasure, a quorum of SMAC's five Directors and to do so to the exclusion of SMAC's true stakeholders, its members. This provision, in Article III of the bylaws, states that any Director of SMAC appointed by Stoughton may be removed at any time by his or her appointing authority.

86.     It is not possible for SMAC Directors to exercise their fiduciary duty and loyalty obligations to SMAC without fear of retaliation or potential liability from Stoughton's political leaders, including Calter, Cavey, and Mokrisky. The bylaws also purport to preclude SMAC's officers or its members from amending any bylaw provision relating to its Directors without Stoughton's approval, stating, "With respect to Article III of these By-laws, any amendment must be additionally approved by majority vote of the Stoughton Board of Selectmen."

87.     The result of these provisions of the bylaws is the threat of political control by Stoughton over SMAC, a public broadcaster, in violation of the Act.

**COUNT I**
**RETALIATION FOR EXERCISE OF FIRST AMENDMENT RIGHTS**
**(42 U.S.C. § 1983)**
**(Against Calter, Cavey, and Mokrisky)**

88.     SMAC hereby repeats, re-alleges, and incorporates by reference the allegations set forth in paragraphs 1 through 87, above.

89.     SMAC is guaranteed the right to free exercise of speech under the First Amendment.

90.     By their conduct, as more particularly described above, Defendants violated SMAC's First Amendment rights by retaliating against SMAC for exercising its right to provide unbiased PEG Access Programming, by restraining SMAC from exercising its right (and obligation) to broadcast stories Defendants perceived to be politically unfavorable, and by compelling SMAC to broadcast stories Defendants perceived to be politically favorable, including by, inter alia:

- again threatening and coercing SMAC with pretextual defaults under the current Access Agreement with Stoughton;

- threatening and coercing SMAC and its officers and employees with false claims of illegal activity under the Act or breaches of the Access Agreement with Stoughton;

- claiming Town Manager Calter is the sole authority in Stoughton with editorial discretion at SMAC, including what SMAC broadcasts and when;

- threats of investigation and prosecution for alleged professional misconduct and illegal actions against SMAC and its officers and employees;

- threats of litigation against SMAC by Stoughton and third parties;

- nonpayment of amounts due to SMAC by Stoughton under the Access Agreement;

- refusal to appropriately account for public funds in the Enterprise Fund per G.L. c. 44, §§ 38 and 53F ½ that funds SMAC's operations under the Act;

- threats that Stoughton will not renew the Access Agreement with SMAC; and

- attempts to use SMAC for political advantage by threat, intimidation, and coercion of SMAC and its employees and officers.

91.    At all times relevant to the deprivation of SMAC's rights by Stoughton, Calter, Cavey, and Mokrisky's conduct against SMAC occurred in the course of performing actual or apparent duties of their respective stations or offices and under color of state law.

92.    Defendants, through their actions described above, attempted to retaliate against SMAC for perceived politically unfavorable speech, restrain SMAC's right to engage in

perceived politically unfavorable speech, and compel SMAC to engage in perceived politically favorable speech, all in violation of SMAC's exercise of its First Amendment rights.

93.    Defendants Calter, Cavey, and Mokrisky are liable to SMAC for the violations of law set forth above.

94.    As a result, SMAC has suffered damages in the form of severe reputational harm, legal fees, and other damages to be proven at trial.

**COUNT II**
***MONELL* FIRST AMENDMENT CLAIM**
**(Against Stoughton and Calter, Cavey, and Mokrisky in their Official Capacities)**

95.    SMAC hereby repeats, re-alleges, and incorporates by reference the allegations set forth in paragraphs 1 through 94, above.

96.    At all times described herein, Calter, Cavey, and Mokrisky each had final policymaking authority for the Town.

97.    Stoughton violated SMAC's First Amendment right to engage in unbiased broadcasting without Stoughton's permission, approval, or prior restraint, including its right to broadcast stories that Stoughton perceives to be politically unfavorable in order to comply with its mandate to provide apolitical, unbiased PEG Access Programming.

98.    Stoughton's actions can be traced to SMAC's deprivation of its First Amendment rights. Specifically, it is the policy or custom of Stoughton, through its officials and government bodies with final decision-making authority, including, in particular, Calter, Cavey, and Mokrisky, to retaliate against SMAC and its employees and officers in response to SMAC's exercise of its First Amendment right to broadcast stories that Stoughton, through its officials and government bodies with final decision-making authority, perceive to be critical of Stoughton.

99.     Stoughton executed this custom and practice, through its officials and government bodies with final decision-making authority, by retaliating against Plaintiff in response to its exercise of First Amendment rights, including, among other acts alleged herein, threatening a lawsuit and SMAC's existence based on pretextual alleged breaches of the Access Agreement, threatening baseless ethics investigations and prosecutions, and withholding amounts due to SMAC under the Access Agreement.

100.    The Town officials and government bodies with final decision-making authority over Stoughton's custom and practice were motivated by malice and self-aggrandizement, and displayed reckless indifference to SMAC's rights.

101.    Stoughton's action was the moving force behind SMAC's deprivation of its First Amendment rights, including, particularly, Stoughton's acts of threatening a lawsuit based on pretextual alleged breaches of the Access Agreement, withholding amounts due to SMAC under the Access Agreement, and refusing to appropriately account for public funds in the Enterprise Fund per G.L. c. 44, §§ 38 and 53F ½.

102.    As a result, SMAC has suffered damages in the form of severe reputational harm, legal fees, and other damages to be proven at trial.

## COUNT III
### MASSACHUSETTS GENERAL LAWS c. 12, § 11I –
### MASSACHUSETTS CIVIL RIGHTS ACT
### (Against Calter, Cavey, and Mokrisky)

103.    SMAC hereby repeats, re-alleges, and incorporates by reference the allegations set forth in paragraphs 1 through 102, above.

104.    SMAC is a public forum created pursuant to the Act, 47 U.S.C. § 531, and therefore enjoys the protections of the First Amendment as to free speech.

105.    By their conduct, as more particularly described above, Defendants violated SMAC's First Amendment rights by retaliating against SMAC for exercising its right to provide unbiased PEG Access Programming, by restraining SMAC from exercising its right to broadcast stories Defendants perceived to be politically unfavorable, and by compelling SMAC to broadcast stories Defendants perceived to be politically favorable, including by, inter alia:

- again threatening and coercing SMAC with pretextual defaults under the current Access Agreement with Stoughton;

- threatening and coercing SMAC and its officers and employees with false claims of illegal activity under the Act or breaches of the Access Agreement with Stoughton;

- claiming Town Manager Calter is the sole authority in Stoughton with editorial discretion at SMAC, including what SMAC broadcasts and when;

- threats of investigation and prosecution for alleged professional misconduct and illegal actions against SMAC and its officers and employees;

- threats of litigation against SMAC by Stoughton and third parties;

- nonpayment of amounts due to SMAC by Stoughton under the Access Agreement;

- refusal to appropriately account for public funds in the Enterprise Fund per G.L. c. 44, §§ 38 and 53F ½;

- threats that Stoughton will not renew the Access Agreement with SMAC; and

- attempts to use SMAC for political advantage by threat, intimidation, and coercion of SMAC and its employees and officers.

106.    At all times relevant to the deprivation of SMAC's rights by Stoughton, Calter, Cavey, and Mokrisky's conduct against SMAC occurred in the course of performing actual or apparent duties of their respective stations or offices and under color of state law.

107.    Defendants, through their actions described above, attempted to retaliate against SMAC for perceived politically unfavorable speech, restrain SMAC's right to engage in perceived politically unfavorable speech, and compel SMAC to engage in perceived politically favorable speech, all in violation of SMAC's exercise of its First Amendment rights.

108.    Defendants conduct constitutes a violation of the Massachusetts Civil Rights Act, which protects the exercise and enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of the Commonwealth of Massachusetts.

109.    Defendants intentional exertion of pressure made SMAC fearful and apprehensive of injury and harm.

110.    Defendants Calter, Cavey, and Mokrisky are liable to SMAC for the violations of law set forth above.

## COUNT IV
### DEFAMATION
(**Against Calter and Cavey**)

111.    SMAC hereby repeats, re-alleges, and incorporates by reference the allegations set forth in paragraphs 1 through 110, above.

112.    Defendants Calter and Cavey had a duty to refrain from defaming SMAC.

113.    Notwithstanding their duty, Defendants Calter and Cavey made statements that damaged the SMAC's reputation, in violation of law.

114.    By their conduct, as more particularly described above, Defendants Calter and Cavey published false and untruthful verbal and written statements about SMAC which exposed SMAC to ridicule or contempt in a considerable and respectable class of the community in the Stoughton Town Crier, social media, and to third parties.

115.    SMAC depends on public support and trust as an unbiased broadcaster to broadcast all points of view on topics of public, educational, and governmental significance such as the School Project. False claims of bias and self-interest interfere with SMAC's activities by prejudicing it in the public estimation and decrease the interest of producers of content in broadcasting on its network and is contrary to its widely known legal obligations.

116.    The statements by Calter and Cavey described above are demonstrably false and prejudiced and harmed SMAC's reputation.

117.    Defendants Calter and Cavey's false statements about SMAC were motivated by actual malice towards SMAC.

118.    Defendants Calter and Cavey knew of the untruthfulness and falsity of the verbal and written published statements and/or failed to exercise reasonable care in determining the truth or falsity of the statements before making and publishing them.

119.    Defendants Calter and Cavey are liable to SMAC for the violations of law set forth above.

120.    As a result, SMAC suffered damages in the form of reputational harm, legal fees, and other damages to be proven at trial.

## COUNT V
## DECLARATORY JUDGMENT - G.L. c. 231A
### (Against Stoughton)

121.    SMAC hereby repeats, re-alleges, and incorporates by reference the allegations

set forth in paragraphs 1 through 120, above.

122.    SMAC's bylaws contain a provision which reads that "Any appointed Director [of

SMAC] may be removed at any time by his or her appointing authority."

123.    Defendant Stoughton claims it has the authority under this provision of SMAC's

bylaws to appoint, then remove, for no cause, a quorum of SMAC's Board of Directors.

124.    The bylaws were drafted by an attorney that simultaneously represented

Stoughton at the time he was providing legal services to SMAC and drafting the original Access

Agreement between Stoughton and SMAC.

125.    This provision allows political control of a source of public broadcasting in

violation of the Act.

126.    The provision exposes any Director to potential liability if recalled by Stoughton

despite that the Director owes a fiduciary duty exclusively to SMAC, which requires loyalty to

SMAC not necessarily to Stoughton.

127.    Given its obligations pursuant to the Act and Access Agreement to provide an

unbiased, apolitical, newsworthy broadcast, SMAC has a definitive interest in its rights under

this provision of the bylaws.

128.    The bylaws also contain a provision that reads, "With respect to Article III of

these By-laws, any amendment must be additionally approved by majority of the Stoughton

Board of Selectmen."

129.    This provision divests SMAC's true stakeholders, its members, from authority to amend SMAC's bylaws and run SMAC in the manner they deem appropriate.

130.    As a result of Defendant Stoughton's purported authorities under the above-described provisions, an actual and justiciable controversy exists between SMAC and Stoughton concerning its bylaws and the operation of SMAC as an independent broadcasting source.

131.    The controversy between SMAC and Stoughton is ripe for adjudication.

132.    As the bylaws constitute the internal rules and regulations that govern its operations and are a contract with its members, SMAC has a definite interest in the interpretation and legality of these bylaws and the above-described provisions.

133.    Pursuant to G.L. c. 231A, § 1, SMAC seeks a declaration that:

    A.    The provisions of the bylaws divesting its members of the ability to amend SMAC's bylaws is invalid; and

    B.    Stoughton has no authority to appoint, then remove, for no cause, a quorum of SMAC's Board of Directors.

## COUNT VI
## BREACH OF CONTRACT
### (Against Stoughton)

134.    SMAC hereby repeats, re-alleges, and incorporates by reference the allegations set forth in paragraphs 1 through 133, above.

135.    The Access Agreement constitutes a valid and enforceable contract between SMAC and Stoughton.

136.    SMAC has performed its obligations under the Access Agreement.

137.    Stoughton has breached the Access Agreement by, *inter alia*:

- nonpayment of amounts due to SMAC by Stoughton under the Access Agreement;

- exercising prior restraint and editorial discretion over SMAC's programming based on political motivations in an attempt to skew SMAC's broadcasts toward predominantly favorable broadcasting of the School Project;

- threatening and coercing SMAC with pretextual defaults under the Access Agreement;

- threatening and coercing SMAC and its officers and employees with false claims of illegal activity under the Act and breaches of the Access Agreement;

- claiming Town Manager Calter is the sole authority in Stoughton with editorial discretion at SMAC, including what SMAC broadcasts and when;

- threats of investigation and prosecution for alleged professional misconduct and illegal actions against SMAC and its officers and employees;

- threats of litigation against SMAC by Stoughton and third parties;

- refusal to appropriately account for public funds in the Enterprise Fund per G.L. c. 44, §§ 38 and 53F ½;

- threats that Stoughton will not renew the Access Agreement with SMAC; and

- attempts to use SMAC for political advantage by threat, intimidation, and coercion of SMAC and its employees and officers,

138.    As a direct and proximate result of Stoughton's breaches of the Access Agreement, SMAC has suffered loss and damages and will continue to suffer loss and damages.

## COUNT VII
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Stoughton)

139.    SMAC hereby repeats, re-alleges, and incorporates by reference the allegations set forth in paragraphs 1 through 138, above.

140.    There exists an implied covenant of good faith and fair dealing in the performance of the Access Agreement.

141.    Through its various actions and inactions described herein, including but not limited to the actions described in Paragraph 137 and all of its sub-parts, Stoughton has wrongfully and intentionally breached the implied covenant of good faith and fair dealing in that it has violated SMAC's reasonable expectations and benefits under the Access Agreement.

142.    As a direct and proximate result of Stoughton's material breaches of the covenant of good faith and fair dealing, SMAC has suffered and continues to suffer loss and damages.

## COUNT VIII
## VIOLATION OF G.L. C. 93A §§ 2 AND 11
### (Against Stoughton)

143.    SMAC hereby repeats, re-alleges, and incorporates by reference the allegations set forth in paragraphs 1 through 142, above.

144.    At relevant times, Stoughton was engaged in the conduct of trade or commerce and operating in a business context within the meaning of G.L. c. 93A.

145.    SMAC engages in trade or commerce.

146.    Stoughton's conduct described herein, including but not limited to: (i) its exercise of prior restraint and editorial discretion over SMAC's programming based on political motivations in an attempt to skew SMAC's broadcasts toward predominantly favorable broadcasting of the School Project; (ii) its threatening SMAC with pretextual defaults under the Access Agreement in an attempt to skew SMAC's broadcasts toward predominantly favorable broadcasting of the School Project; and (iii) its threats of litigation, investigation, and prosecution for alleged professional misconduct and illegal actions against SMAC and its officers and employees in an attempt to skew SMAC's broadcasts toward predominantly favorable broadcasting of the School Project are unfair and deceptive acts or practices and have an extortionate quality that gives them the rancid flavor of unfairness.

147.    At all relevant times, the conduct of Stoughton described herein occurred primarily and substantially in Massachusetts.

148.    Stoughton's misconduct and violations of Massachusetts law were undertaken in trade or commerce as that term is defined in G.L. c. 93A.

149.    Stoughton's actions and omissions were unfair and deceptive acts or practices as those terms are defined in G.L. c. 93A.

150.    Stoughton's conduct constitutes a willful and/or knowing violation of G.L. c. 93A.

151.    As a direct and proximate result of Stoughton's unfair and deceptive acts or practices, SMAC has suffered loss and damages and will continue to suffer loss and damages.

## PRAYERS FOR RELIEF

WHEREFORE, SMAC respectfully requests this Court grant it the following relief:

1.    Enter a declaratory judgment as follows:

      a.    The provisions of SMAC's bylaws divesting its members of the ability to amend SMAC's bylaws without Stoughton's approval is invalid; and

      b.    Defendants have no authority to appoint, then remove, for no cause, a quorum of SMAC's Board of Directors;

2.    Enter a judgment in favor of SMAC and against Defendants on all counts of the Complaint;

3.    Award SMAC compensatory, special, and punitive damages in an amount to be determined at trial, including multiple damages as provided by G.L. c. 93A;

4.    Award SMAC its attorneys' fees, costs, and interest as permitted by law; and

5.    Grant such further and other relief as this Court deems just and proper.

## JURY DEMAND

SMAC requests a trial by jury on all claims or issues so triable.

**STOUGHTON MEDIA ACCESS CORPORATION,**

By Its Attorneys,


 /s/ *Joseph P. Zoppo*
Joseph P. Zoppo (BBO #558423)
Peres, Zoppo & Associates
Attorneys at Law
6 Cabot Place, Suite 10
Stoughton, MA 02702
Tel:    (781) 436-8440
Fax:    (781) 251-6649
jzoppo@pereszoppo.com

/s/ *Zachary M. Wallack*
Zachary M. Wallack (BBO #687965)
Matthew D. Rodgers (BBO #681761)
Trevin C. Schmidt (BBO #703916)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Two International Place, 16th Floor
Boston, MA 02110-2602
Tel:    (617) 342-6800
Fax:    (617) 342-6899
zwallack@eckertseamans.com
mrodgers@eckertseamans.com
tschmidt@eckertseamans.com

Dated: April 10, 2025

<u>Exhibit "A"</u>

# ACCESS CORPORATION AGREEMENT

# BETWEEN

# STOUGHTON MEDIA ACCESS CORPORATION ("S.M.A.C.")

# AND THE TOWN OF STOUGHTON, MA.

## Article I – PREAMBLE

WHEREAS, the Town of Stoughton, which is a municipal corporation organized under the laws of the Commonwealth of Massachusetts ("MUNICIPALITY"), acting by and through its Select Board, issued a Cable Television Renewal License ("Renewal License") to Comcast Cable Communications, Inc. ("Comcast"), as well as an initial cable television license to Verizon New England, Inc. ("Verizon") (together, "Cable Licensees") both for the provision of cable television services via cable and or fiber optics within its municipal boundaries, and

WHEREAS, the Cable Licenses provide for Comcast and Verizon to make to the MUNICIPALITY certain annual and periodic grants of money called "PEG Access Support" and

WHEREAS, it is the intent of the MUNICIPALITY that such annual grants and or any future funding source for PEG Access Programing ("Public Educational and Governmental Access") should be used for the support and furtherance of PEG Access Channels pursuant to 47 U.S.C. §531, and

WHEREAS, Stoughton Media Access Corp. ("S.M.A.C.") fulfills the mission of providing the PEG Access Channels provided by the LICENSEES to the MUNICIPALITY pursuant to 47 U.S.C. §531, and

WHEREAS, it is the intent of the Town of Stoughton to participate in the provision of PEG Access Services to the residents of Stoughton as more fully provided by the terms of this Agreement, and by the terms of the Cable Licenses issued by the Stoughton Select Board to Comcast and Verizon, and

NOW THEREFORE, it is agreed by and between the Town of Stoughton, acting by and through its Select Board, and S.M.A.C., acting by and through its Board of Directors ("the Parties"), as follows:

## Article II – DEFINITIONS

For the purpose of this agreement the following words, terms, phrases, and their derivations shall have the meaning given herein.  When not inconsistent with the context, words used in the plural include the singular, and words used in the singular include the plural.  The word "shall" is mandatory.

1.    Access Agreement, or Agreement: The Access Corporation Agreement between the Stoughton Media Access Corporation, ("S.M.A.C."), and the Town of Stoughton.

2.    Access Channel: A video channel which the Licensee(s) shall make available without charge for the purpose of transmitting programming by members of the public, Town departments, and agencies, public schools, educational, institutional, and similar organizations.

2

3.    <u>Access Corporation</u>: Stoughton Media Access Corporation ("S.M.A.C."), the ACCESS CORPORATION, designated by the Select Board of the Town of Stoughton pursuant to Article III of this Agreement, and to the relevant sections of the Cable Licenses for the Town of Stoughton.

4.    <u>Access Facility</u>: The location from which the Access Corporation operates the public, educational and municipal access functions; at a studio located in the Town of Stoughton, Massachusetts.

5.    <u>Access Programming</u>: Programs on the designated Access Channels which shall be non-commercial within the standards for underwriting applicable to the Public Broadcasting Service (PBS), or the standards necessary for S.M.A.C. to maintain its tax-exempt status within the applicable regulations of the Internal Revenue Service, and such programming excludes political advertising.

6.    <u>CATV</u>: Cable Access Television.

7.    <u>Cable Advisory Committee</u>: The Stoughton Cable Advisory Committee as it may be appointed by the Select Board.

8.    <u>Cable Licenses, or Renewal Licenses</u>: The license agreements between Stoughton and Comcast and Verizon (the current "LICENSEES"), authorizing LICENSEES to own, operate and maintain the Cable or similar Television Systems in the MUNICIPALITY.

9.    <u>Commercial Program</u>: Programming from which revenue is derived, by any party, and programming the purpose of which is to conduct trade or commerce.  It shall not include programming supported by underwriting grants or contributions of any kind.

10.    <u>Downstream Channel</u>: A channel over which signals travel from the system headend to an authorized location within the system.

11.    <u>Educational Access</u>: Any channel or time thereon which has been allocated for educational use in accordance with this Agreement, the License Agreements, and 47 U.S.C. §531.

12.    <u>Governmental Access</u>: Any channel or time thereon which has been allocated for governmental use by the MUNICIPALITY, the Issuing Authority, or municipal agencies in accordance with this Agreement and 47 U.S.C. §531.

13.    <u>Issuing Authority</u>: The Select Board of the Town of Stoughton, who is party to this Agreement.

14.    <u>Licensee</u>: Comcast or Verizon, or their authorized transferees or successors in the provision of PEG Programming and Access Channels as herein defined.

15.    <u>Municipality (or "Town")</u>: The Town of Stoughton, Massachusetts.

16.    Public Access: The availability for use by any resident of, or any organization based in or serving the MUNICIPALITY, of designated public access facilities, equipment, training and/or channels of the Cable Television System, as provided in the Cable Licenses with the MUNICIPALITY and in accordance with 47 U.S.C. §531.

17.    "S.M.A.C.": The non-profit corporation known as Stoughton Media Access Corporation, designated by the Select Board to manage and operate public, educational and government Cable Access TV in the Town of Stoughton in accordance with this Agreement and 47 U.S.C. §531.

18.    Upstream Channels: A channel over which signals travel from an authorized location to the cable system headend.

### Article III – DESIGNATION

Pursuant to the respective Articles and provisions in the Cable Licenses or as they may be hereafter amended or renewed, or as they may be supplanted or replaced by agreement or otherwise with any other method of distributing CATV or CATV-like content, the Select Board, as Issuing Authority, hereby Designates Stoughton Media Access Corporation ("S.M.A.C.") as its Designee and ACCESS CORPORATION within the meaning of that term as currently employed in the Cable Licenses for the Town of Stoughton or as hereafter amended or renewed or supplanted or replaced by agreement or otherwise. This Designation hereby authorizes S.M.A.C. to receive certain PEG Access grants, as more fully set forth in the Cable Licenses for the Town of Stoughton, and further authorizes S.M.A.C. to operate for the MUNICIPALITY the PEG Access channels and services described in the relevant terms of the Cable Licenses.

### Article IV – TERM OF DESIGNATION

Unless otherwise terminated with the Designation withdrawn for good cause shown as provided in Article VII of this Access Agreement, the term of this Designation shall become effective when executed by all Parties hereto, and this Access Agreement shall continue unless terminated for good cause shown as provided in Article VII.

### Article V – OBLIGATIONS OF ACCESS CORPORATION

**Section 1:**    Public Access Use: Operating Rules and Procedures.

S.M.A.C. shall be solely responsible for its management and the operation of Public Access Programming on the cable system in the MUNICIPALITY, including training, quality of originated signals in cooperation with Comcast or Verizon or successor Licensee(s), scheduling the Public Access Channel(s) and managing the Access Facilities and equipment. S.M.A.C. shall promulgate and maintain a set of access operating rules and procedures which ensure that training, equipment, facilities, and Access Channel time shall be available to residents of the Town of Stoughton and educational, governmental, health care, arts, religious, business, civic, and other entities, which are based in or serve the MUNICIPALITY. These rules shall ensure the right to use Access Channels, facilities,

4

and equipment on a non-discriminatory, first-come, first-served basis subject to the terms of this Access Agreement and subject also to S.M.A.C.'s goal of establishing regularly scheduled programming. Access user compliance with such rules shall be monitored by S.M.A.C. and periodically reviewed by the Issuing Authority of the MUNICIPALITY.

**Section 2:**    Programming on the Public Access Channel.

Editorial discretion, the content of programming and the liability for programming placed on those Access Channel(s) which are operated by S.M.A.C. shall solely reside in and be the sole responsibility of the access producers and S.M.A.C. and not the MUNICIPALITY nor their LICENSEES. Notwithstanding the foregoing, S.M.A.C. programming shall be designed to achieve the purposes set forth in S.M.A.C.'s Articles of Incorporation and Bylaws and shall consist of Access Programming as defined in the Cable Licenses and by law. To these ends:

(a)    S.M.A.C. shall not sell to a third party any proprietary interest that S.M.A.C. may have in any Access Programming without first offering LICENSEES the right to purchase such interest by matching the best good faith offer tendered in writing by the third party;

(b)    All liability, license and copyright fees associated with the programming produced by S.M.A.C. or placed on the access channels serving the MUNICIPALITY shall be the sole responsibility of S.M.A.C.

**Section 3:**    Coverage of Local Meetings.

S.M.A.C. shall be solely responsible for providing live coverage of all regularly scheduled meetings of the Select Board, School Committee and Town Meeting for the MUNICIPALITY, to the fullest extent practicable and possible. In addition to the foregoing, S.M.A.C. shall provide live coverage of one additional public meeting, per quarter, if requested by the MUNICIPALITY, upon thirty (30) days written notice, to the fullest extent practicable and possible.

**Section 4:**    Cooperation with School Department.

S.M.A.C. shall cooperate with the school department of the MUNICIPALITY in partnership and assist in the coverage of important or significant school events, provided the request is made in writing at least thirty (30) days prior to such event, and further provided that sufficient S.M.A.C. resources are available for the requested coverage.

**Section 5:**    Cooperation with Municipal Government.

S.M.A.C. shall cooperate with the Issuing Authority of the MUNICIPALITY in the coverage of governmental meetings, based on available resources.

The president of the S.M.A.C. Board of Directors or his or her designee shall provide the Select Board with a quarterly update on the status of operations and capital

planning to facilitate communication, transparency, and compliance with this Agreement. Any representative of the MUNICIPALITY may attend meetings of the S.M.A.C. Board of Directors that are open to the public. The Select Board may designate any of its members and/or the Town Manager as the liaison to the S.M.A.C. Board of Directors to further facilitate communication, transparency, and compliance with this Agreement.

**Section 6:**     Logs.

S.M.A.C. shall keep a log of all Access Programming transmitted on the Access Channel(s) and the names and addresses of all access producers. The logs will be available for public inspection and retained for not less than two years.

**Section 7:**     Insurance.

(a)     At all times during the term of this Access Agreement, S.M.A.C. shall obtain, pay premiums for, and keep current the following policies of insurance:

(1)     A General Commercial liability policy with a minimum liability coverage of One Million Dollars ($1,000,000.00) for injury or death to any one person in any one occurrence and Two Million Dollars ($2,000,000.00) for injury to two (2) or more persons in any one occurrence arising out of any S.M.A.C. activity under this Access Agreement;

(2)     Property damage insurance policy for any and all claims of property damage occasioned or alleged to be occasioned by any S.M.A.C. activity under this Access Agreement, including but not limited to the construction, installation, maintenance or operation of a cable television access studio under this Access Agreement, with a minimum liability coverage of One Million Dollars ($1,000,000.00) for damage to the property of any one person in any one occurrence and Two Million Dollars ($2,000,000.00) for damage to the property of two (2) or more persons in any one occurrence;

(3)     Automobile liability insurance for owned, leased or borrowed by S.M.A.C. automobiles, non-owned automobiles and/or rented automobiles undertaking S.M.A.C. business in the amount of:

(A)     One Million Dollars ($1,000,000.00) for bodily injury and consequent death per occurrence;

(B)     One Million Dollars ($1,000,000.00) for bodily injury and consequent death to any one person; and

(C)     Five Hundred Thousand Dollars ($500,000.00) for property damage per occurrence.

(4)     Worker's Compensation in the minimum amount provided by statute.

6

(5)    Producers' Liability Insurance in the amount of One Million Dollars ($1,000,000) to cover slander, libel, copyright infringement, infliction of emotional distress, and invasion of privacy or publicity rights.

(b)    For all insurance policies required by this Access Agreement, the following conditions shall apply:

(1)    Such Insurance shall commence no later than thirty (30) days following the establishment of the Access Corporation, or the date of the execution of this Agreement, whichever shall occur last;

(2)    Such Insurance shall be primary with respect to any insurance maintained by the MUNICIPALITY and shall not call upon the MUNICIPALITY'S insurance for contribution;

(3)    Such Insurance shall be obtained from brokers or carriers licensed to transact business in the Commonwealth of Massachusetts;

(4)    Evidence of compliance in the form of certificates of Insurance shall **be submitted to the MUNICIPALITY periodically during the term or terms of this Access Agreement.**

**Section 8.    Indemnification by Access Corporation of MUNICIPALITY.**

S.M.A.C. shall defend, indemnify and hold harmless the MUNICIPALITY, its officials, boards, commissions, agents and/or employees and LICENSEES, and their officers, employees, servants and agents, from and against any claim made by a third party, without limitation, arising from S.M.A.C.'s activities under this Access Agreement, whether expressly authorized by such Agreement or otherwise, including but not limited to claims in the nature of libel, slander, copyright infringement, infliction of emotional distress, and invasion of privacy or publicity rights, non-compliance with applicable laws, license fees and reasonable attorneys' fees.  In addition, S.M.A.C. shall, in its rules for public access, require every access user to indemnify LICENSEE, S.M.A.C. and the MUNICIPALITY, and to defend, indemnify and hold them harmless against any claims arising out of any program or program material produced and/or cablecast by it, including but not limited to claims in the nature of libel, slander, invasion of privacy, obscenity, civil rights or publicity rights, non-compliance with applicable laws, license fees, unauthorized use of copyrighted material, and infliction of emotional distress including reasonable attorneys' fees.

**Section 9:    Review, Annual Report and/or Audit.**

Reviews, reports or audits of its finances and operations shall be conducted and provided annually by S.M.A.C. as may be required by the regulations of the Attorney General as they may be amended, to its members, if any, to the Stoughton Cable Advisory Committee, to the Issuing Authority and MUNICIPALITY, and if requested, to

LICENSEES within ninety (90) days after the close of S.M.A.C.'s fiscal year or within sixty (60) days after the filing of its state and federal tax returns, including any tax extensions filed by S.M.A.C., whichever is later, or at such other time as may be agreed upon by the Parties.

Current Attorney General guidelines provide that an audit is required if an organization's gross support and revenue exceeds $500,000 in a fiscal year. Organizations with gross support and revenue of more than $200,000 up to $500,000 in a fiscal year are required to complete an annual review.

Review of S.M.A.C.'s performance by the MUNICIPALITY, its Issuing Authority, or its designee(s) ("Performance Review"), if conducted, shall be conducted fifteen business days after receipt of the annual review, report, or audit from S.M.A.C. and written notice to S.M.A.C. or at such other time as mutually agreed by the Parties. The Performance Review shall be conducted at a duly noticed meeting of the Select Board at which S.M.A.C. shall be heard. At any such Performance Review all S.M.A.C. officers, directors, attorneys, agents, or managers requested by S.M.A.C., the MUNICIPALITY or its Issuing Authority or designees shall be in attendance. In the event the MUNICIPALITY determines it requires a designee or third party to conduct a Performance Review or Audit, such third party shall be impartial, objective, disinterested, and professionally qualified. Any substantive issues, deficiencies, breaches or defaults raised or found by the MUNICIPALITY, its Issuing Authority, or its designee as a result of the Performance Review shall be provided to the S.M.A.C. Board of Directors by written notice within sixty (60) days of the Performance Review and any determination shall follow the procedures set forth in Article VIII, Section 1 of this Agreement.

**Section 10:**    Status as Non-Profit 501(c)(3) Corporation.

S.M.A.C. shall, throughout the term of this Access Agreement, maintain its status as a non-profit 501(c)(3) corporation, securing and maintaining all requisite legal designations, and filing all appropriate periodic statements, forms or reports as may be required from time to time by law or regulation. S.M.A.C. shall otherwise maintain compliance with all applicable laws, rules and regulations of the MUNICIPALITY, Commonwealth of Massachusetts, and the United States of America as shall be enacted from time to time.

**Section 11:**    Maintenance of Records, Equipment and Property; Equipment Inventory.

S.M.A.C. shall maintain accurate books, records, and logs of its financial and programming activities, and it shall maintain the facilities and equipment provided to it in good repair and safekeeping. Annually, at the time of filing the Annual Review, Report and/or Audit, S.M.A.C. shall provide to the Issuing Authority an inventory of said equipment and facilities together with a statement of its condition and corrective action, if any needed, taken or recommended to be taken to maintain all items in satisfactory condition.

S.M.A.C. shall prepare and approve annually a revolving three (3) year capital budget that identifies equipment requiring replacement due to obsolescence or that has or will reach the expiration of its anticipated useful life during that three (3) year term. This information shall be included in the president's quarterly update to the Select Board, in accordance with Article V, Section 5 of this Agreement.

**Section 12:**    Access to Records.

S.M.A.C. shall allow the MUNICIPALITY, and/or its authorized designees(s) access to the books, records, accounts, and facilities of S.M.A.C. referenced in Paragraph 11 at such reasonable times and in such reasonable places as the MUNICIPALITY may require to ensure compliance with this Access Agreement.

**Section 13:**    Political Activities Prohibited.

No funds nor facilities nor equipment provided hereunder shall be used for any partisan political activity or to further the election or defeat of any particular candidate for public office. Such prohibition shall not apply to public interest forums, public presentations or the like where the facilities are available for the expression of all points of view for informational purposes.

**Section 14:**    Reversion of Property Upon Termination.

**Within such time as S.M.A.C. may reasonably wind down its operations, employment and contract obligations, including any real property or other lease(s) and financial obligations after termination of this ACCESS AGREEMENT, title to all property, equipment, facilities, and undisbursed funds and all other assets of the Access Corporation shall be transferred to the MUNICIPALITY, or to its Issuing Authority, or to their designees. S.M.A.C. shall cooperate fully with the MUNICIPALITY and its Issuing Authority or designees in effecting a smooth and prompt transfer of its assets and transition of its services to alternative provider(s).**

**Section 15:**    Audio Video Recording of S.M.A.C. Meetings.

S.M.A.C. shall record by audio and video or livestream its Annual Meeting and make it available on the Access Channel. S.M.A.C. may record by audio and video or livestream Special Meetings or other meetings of the members of S.M.A.C. or its Board of Directors.

**Section 16:**    Meetings of the Board of Directors, Notice.

The Massachusetts Open Meeting Law (M.G.L. Ch. 30A, §§ 18-25) does not apply to SMAC. All meetings of the Board of Directors shall be open to the public unless the Board, in its discretion, decides to enter into a private session of the Board of Directors for the purposes of conducting sensitive business.

Reasons for holding a private session of the Board of Directors may include: matters which in the business judgment of Directors would be better to hold in private; matters in which the Board of Directors have a fiduciary duty to the Corporation to address in private; to discuss personnel matters; to meet with legal counsel; to discuss anticipated or pending litigation; to discuss contract negotiations; to discuss confidential or sensitive Corporation business; or for other reasons in the best interest of the Corporation.

S.M.A.C. shall provide notice of all meetings of the Board of Directors in the following manner: S.M.A.C. shall provide notice of the meeting to the Town Clerk's Office and post a notice on its website 48 hours before the meeting, excluding Saturdays, Sundays, and holidays; in an emergency, the notice shall be posted as soon as reasonably possible prior to the meeting.

## Article VI – ADDITIONAL TERMS

Additional terms, for any length of time, may be mutually agreed upon by the Parties in writing.

## Article VII – TERMINATION

This Access Agreement, and/or any subsequent Designation or extension thereof made under authority of this Access Agreement, shall terminate upon the occurrence of any of the following events:

(A)    The filing of bankruptcy of S.M.A.C.;

(B)    The expiration of the then-current Term as defined in Article IV hereof, or any extension of the Term, including by course of dealing, of this Access Agreement, or in the event that the MUNICIPALITY terminates this Agreement with the Designation for good cause shown, in the manner provided in Article VIII, terminating S.M.A.C. as its PEG Access provider; or

(C)    The withdrawal of Designation by the MUNICIPALITY arising from any breach of this Access Agreement by S.M.A.C. which remains outstanding and uncured in whole or in part following notice, opportunity to cure, and an opportunity to be heard at a duly noticed meeting of the Select Board as more fully provided in Article VIII of this Access Agreement.

## Article VIII – BREACH AND SANCTIONS

**Section 1:**    Determination of Breach.

Upon determining that a possible material breach of this Access Agreement may have occurred, the MUNICIPALITY shall serve written notice of such possible breach upon S.M.A.C.  Upon receipt of such written notice of possible breach, S.M.A.C. shall have sixty (60) days to respond in one of the following ways: (1) cure such breach and report the cure to the MUNICIPALITY; (2) provide the MUNICIPALITY with proof that

such breach did not occur; (3) if the breach was due to any fault on the part of S.M.A.C., but for reasons beyond its control, and such breach cannot be cured within sixty (60) days, provide proof of same to the MUNICIPALITY, and a reasonable, detailed timetable for correction and cure; or (4) if the breach was not due to any fault on the part of S.M.A.C. and cannot be cured within sixty (60) days, provide proof of same to the MUNICIPALITY and a reasonable, detailed timetable for cure.  S.M.A.C. shall submit such response(s) for approval by the MUNICIPALITY which shall take up the issue within a reasonable time thereafter at a duly noticed meeting of the Select Board with an opportunity for S.M.A.C. to be heard and at which the Select Board shall make its determination whether a breach occurred, has been cured or is waived by the MUNICIPALITY.

If, after notification, opportunity to respond including to cure and to be heard as provided in this section, the MUNICIPALITY determines that a breach of this Access Agreement did occur, and that such breach was not cured or otherwise excused or waived within the time duly specified by the procedures set forth in this section, the MUNICIPALITY may elect one or more of the following remedies 10 days after sending written notice to S.M.A.C. of the determination: (1) withdraw its Designation of S.M.A.C. granted under Article III of this Access Agreement, and thereby terminate this Access Agreement;  (2) impose Liquidated Damages as set forth in Section 2 of this Article: (3) impose any other sanction as may be lawfully determined to be reasonable under the circumstances: or (4) excuse or waive the breach for good cause shown.   The MUNICIPALITY shall send S.M.A.C. written notice of its determination of its election of remedies (1) – (4) within two (2) business days of its determination.

**Section 2:**     <u>Liquidated Damages</u>.

Liquidated damages up to the amount set forth below, from the day of the notice of the MUNICIPALITY'S determination of its election in the final sentence of Section 1 above, may be assessed against S.M.A.C. by the MUNICIPALITY after determining a breach of this Access Agreement after notice and opportunity to respond including to cure as set forth in Section 1 of Article VIII.   Upon assessment of such damages, the MUNICIPALITY may require S.M.A.C. to pay such damages to the MUNICIPALITY within thirty (30) days of its receipt of such a written demand for payment.  Failure to pay such damages within thirty (30) days of receipt of a written demand shall itself constitute a breach of this Access Agreement.  In the event of ongoing penalties, successive and non-cumulative written demands may be sent.

(a) For failure to maintain qualified, fully trained, and competent personnel to manage and operate the Public Access Program, to ensure compliance with Article V, Section 1, <u>$50.00</u> per day;

(b) For failure to provide live coverage of local meetings in accordance with Article V, Section 3, <u>$50.00</u> per day;

(c) For failure to maintain insurance policies required by Article V, Section 7, <u>$25.00</u> per day;

11

(d) For failure to prepare or produce Annual Review, Report or Audit in accordance with Article V, Section 9; or for failure to maintain Access Programming Logs as required by Article V, Section 6, or for failure to grant to the Issuing Authority or its authorized representatives access to the books, records, accounts and facilities at such reasonable times and at such reasonable places as the Issuing Authority or its authorized representatives may require, in accordance with Article V, Section 12, $25.00 per day; and

(e) For any other breach of this Access Agreement as may be determined by the MUNICIPALITY in the manner provided in Article VIII, Section 1, $50.00 per day.

Liquidated damages are a non-exclusive remedy and may be used alone, or in combination with any other remedy for breach permitted under Article VIII, Section 1.

## Article IX – FUNDING/ANNUAL SUPPORT/FUND RAISING

S.M.A.C. shall be funded by annual and/or periodic grant payments, or by a combination of the two, made to it directly by the LICENSEES, or any future funding source for PEG Access Programing and/or the MUNICIPALITY pursuant to the relevant provisions of the Cable Licenses or as those Licenses may be supplanted or replaced by agreement or otherwise with any other method of distributing CATV or CATV-like content. The grant payments provided by the Cable Licenses may be made by LICENSEES directly to S.M.A.C. in accordance with the terms of the respective Cable Licenses, and upon written request of the Issuing Authority to the LICENSEES. S.M.A.C. shall invoice the MUNICIPALITY monthly in arrears payable within thirty (30) days.

S.M.A.C. shall maintain an account at a banking/financial institution located in Stoughton where operating funds are held. This requirement shall not interfere with S.M.A.C.'s ability or the Board of Director's or Officers' fiduciary duties to S.M.A.C. including to obtain favorable interest rates and to make the best use of the Corporation's assets.

After providing fourteen (14) days written notice to the Issuing Authority, S.M.A.C. may also undertake its own non-profit fundraising campaigns or drives. S.M.A.C. may also directly receive, or through the MUNICIPALITY, funding for PEG Access from state, federal or other public or private entities.

## Article X – CABLE ADVISORY COMMITTEE

At the discretion of the Issuing Authority, the Issuing Authority may vest S.M.A.C. with such power and authority as the Issuing Authority may lawfully and from time to time delegate to S.M.A.C. regarding a Cable Advisory Committee.

## Article XI – ACCESS CORPORATION ORGANIZATION

**Section 1:**    Board of Directors.

12

The Access Corporation agrees it shall have a Board of Directors composed of up to five directors: (1) Two directors shall be appointed by the Select Board for a term of two (2) years, one of whom should be a Senior Citizen (65 years or older) if possible, and each of whom shall be Stoughton residents; (2) One director shall be appointed by the School Committee for a term of two (2) years and shall be a Stoughton resident. The remaining directors shall be determined as provided by the Access Corporation's Bylaws as they may be amended.

The Access Corporation agrees its Board of Directors shall have all of the usual overall policy setting and oversight powers customary for a corporate Board of Directors provided by law and by its Bylaws as they may be amended.

**Section 2**:    Access Corporation Officers.

The Access Corporation agrees the selection, duties, and terms of the Access Corporate Officers shall be as provided by the Access Corporation's Bylaws and Policies, Rules and Procedures as they may be amended.

**Section 3**:    Access Corporation Members.

The Access Corporation agrees its Board of Directors may establish membership in the Access Corporation under such terms and conditions as it may deem necessary or desirable to promote public participation in, and funding of, the Access Corporation, and consistent with the provisions of Article II of the Access Corporation Bylaws and Policies and Procedures as they may be amended.

**Section 4**:    Access Corporation Bylaws.

The Access Corporation Bylaws, as adopted by the incorporators at the time of incorporation and thereafter as may be amended, shall serve as the effective Bylaws of the Access Corporation.

The Access Corporation agrees that within forty-five (45) days of the full execution of this Agreement, S.M.A.C. shall update and amend its Bylaws as may be necessary or advisable to be consistent with this Agreement.

### Article XII – MISCELLANEOUS

**Section 1:**    Assignment and Successors Bound.

This Access Agreement shall inure to the benefit of the MUNICIPALITY and to their successors and assigns. No assignment of any legal right may be made by S.M.A.C. without the express written consent of the MUNICIPALITY except as may be required by law or necessary in the judgment of the employees, officer(s) and or director(s) of S.M.A.C. to discharge their fiduciary duties to S.M.A.C.

13

**Section 2:**     Waiver and Amendment.

Nothing in this Access Agreement shall prevent all Parties from agreeing to waive or amend any provisions of this Agreement by mutual agreement. Any such waiver must be confirmed by all Parties in writing. No amendment shall be made to this Access Agreement unless executed in full in the same form as the original Agreement. No waivers or amendments agreed, in writing, upon or pursuant to this section, shall prejudice any remaining provisions of this Access Agreement and all such remaining provisions shall at all times remain in full force and effect.

**Section 3:**     Construction.

The headings herein are for reference and convenience only and shall not be a factor in the interpretation of this ACCESS AGREEMENT. This ACCESS AGREEMENT shall be interpreted and construed under the laws of the Commonwealth of Massachusetts without regard to its conflict of laws provision(s). The Parties agree that any dispute arising out of or related to this Access Agreement shall be decided exclusively by the state or federal courts located in the Commonwealth of Massachusetts.

**Section 4:**     Severability.

If any provision of this ACCESS AGREEMENT is determined to be illegal or unenforceable by any court, to the maximum extent possible such determination shall have no effect upon the validity of all remaining sections of the Agreement which shall remain in full force and effect for the full term of this Agreement.

**Section 5:**     Force Majeure.

If by any reason of Force Majeure any party is unable in whole or in part to carry out its obligations under this ACCESS AGREEMENT, that party shall not be deemed to be in breach or default during the pendency of such inability. The term "Force Majeure," as used in this ACCESS AGREEMENT shall have the following meanings: Act of God; act of public enemy; orders of any kind of the government of the United States of America, Commonwealth of Massachusetts or of any of their departments, subdivisions, officials, or of any civil or military authorities; insurrections; riot; epidemic; pandemic; landslide; lightning; earthquake; fires; hurricanes, volcanic activity; storms; floods; wash outs; droughts; civil disturbances; explosions; strikes; acts of terrorism; and unavailability of essential personnel, equipment, services, or material beyond the control of any Party.

**Section 6:**     Entire Agreement.

This Access Agreement contains the entire agreement between the Parties, supersedes all prior agreements or proposals except as specifically incorporated herein, and cannot be changed except by an instrument in writing executed by the Parties and in the same form as this Agreement.

**Section 7:**     Notice.

14

Any notice delivered hereunder shall be valid if sent by a national, overnight delivery service that maintains and makes available proof of delivery to the following addresses which may be revised in writing by the Town of Stoughton or S.M.A.C.:

The MUNICIPALITY:

Town of Stoughton:                    Chair, Select Board
                                      Stoughton Town Hall
                                      10 Pearl Street
                                      Stoughton, MA 02072

Stoughton Media Access Corp.:         President, Stoughton Media Access Corp.
                                      421 Page St., Suite 2
                                      Stoughton, MA 02072

**SIGNED AS A SEALED AGREEMENT:**

*TOWN OF STOUGHTON, MASSACHUSETTS,*
By its Select Board,

_____       Dated: 09 / 05 / 2023
Debra Roberts, Chair

_____       Dated: 09 / 05 / 2023
Joseph M. Mokrisky

_____       Dated: 09 / 05 / 2023
Stephen M. Cavey

_____       Dated: 09 / 05 / 2023
Scott Carrara

_____       Dated: 09 / 05 / 2023
Louis F. Gitto

*STOUGHTON MEDIA ACCESS CORP.*
*By its President,*

_____       Dated: August 9, 2023
Robert Mullen
President, Duly Authorized

15